4.25    Management.  The management of the Facility shall be by either Manager, Borrower or an Affiliate of Borrower approved by Agent, for so long as Manager, Borrower or said Affiliate is a professional management company or administrator approved by Agent and is not prohibited from providing any services to Borrower by any Governmental Authority or applicable laws.  Such management arrangement shall be pursuant to a written Management Agreement approved by Agent.  In no event shall any Manager be removed or replaced or any Management Agreement materially modified or amended, extended, terminated, canceled or replaced without the prior written consent of Agent, which consent shall not be unreasonably withheld, and without the written consent or approval if required by applicable law, regulation, or policy of any Governmental Authority that has direct or indirect authority or oversight over Borrower, Operator or the Facility, or the operations conducted at the Facility.  In the event of (a) an Event of Default hereunder which results in an acceleration of the Loan and Agent or any Lender takes an action toward foreclosure or implementation of similar remedies available under the laws of the state in which the Property is located, or (b) a change in control of the Manager (other than any involuntary change in control caused by the death of any partner, shareholder, member, joint venturer, or beneficial owner of a trust so long as Manager is reconstituted, if required, following such death, and those persons responsible for the management of the Facility remain unchanged as a result of such death), or (c) the Manager becomes insolvent or the debtor in any bankruptcy or insolvency proceeding, Agent shall have the right to terminate, or to direct Borrower to terminate or cause Operator to terminate, such Management Agreement upon 30 days' notice and to retain, or cause Operator to retain, or to direct Borrower to retain, a new Manager approved by Agent.

4.26    Mortgage Tax.  Borrower hereby agrees to pay any and all documentary stamp taxes and intangible taxes which may become due and payable in connection with any of the Security Instrument, together with any fines, penalties, interest or similar charges resulting from the non-payment thereof, whenever the same shall become due and payable, whether upon the recording of the Security Instrument or at any later date.  Borrower hereby agrees to indemnify, defend, and hold harmless Lenders from and against any and all claims, charges, actions, suits, proceedings, law suits, obligations, losses, damages, expenses or liabilities (joint and/or several) including, without limitation, reasonable attorney's fees, suffered or incurred by any Lender as a result of any assessment by any applicable Governmental Authority with respect to recording fees and expenses, including documentary stamp taxes and intangible taxes, now or at any time hereafter payable with respect to the recording of the Security Instrument; this indemnification shall be a continuing one and shall be unaffected by the fact that the Loan has been repaid in full. Borrower acknowledges that Lenders have relied and were entitled to rely upon the agreements set forth in this Section as a material condition precedent to the making of the Loan.  It shall be an Event of Default under this Agreement if Borrower defaults in its obligations hereunder.

4.27    Post-Closing Agreements.  As applicable, Borrower or Operator shall timely satisfy the post-closing requirements of Schedule 4.27 of this Agreement.

ARTICLE V
NEGATIVE COVENANTS OF BORROWER

Until the Loan Obligations have been paid in full, Borrower shall not, nor shall Borrower suffer, permit, tolerate or allow Operator or Guarantor to:

54

74561574v.6

5.1     Assignment of Licenses and Permits.  Assign or transfer any of its interest in any Permits (including Facility Licenses), Certificates of Need (if required) or Reimbursement Contracts (including rights to payment thereunder) pertaining to the Facility, or assign, transfer, or remove or permit any other Person to assign, transfer, or remove any records pertaining to the Facility including, without limitation, patient records, medical and clinical records (except for removal of such patient records as directed by the patients owning such records), without Agent's prior written consent, which consent may be granted or refused for any reason or for no reason whatsoever in Agent's sole and absolute discretion.

5.2     No Liens; Exceptions.  Create, incur, assume or suffer to exist, or permit, tolerate or allow Operator to incur, assume or suffer to exist, any Lien upon or with respect to the Property and Improvements or any of its properties, rights, income or other assets relating thereto, including, without limitation, the Collateral, whether now owned or hereafter acquired, other than the following permitted Liens:

(a)     Liens at any time existing in favor of Agent and Lenders;

(b)     Permitted Encumbrances;

(c)     Inchoate Liens arising by operation of law for the purchase of labor, services, materials, equipment or supplies, provided payment shall not be delinquent and, if such Lien is a lien upon any of the Property or Improvements, such Lien must be fully disclosed to Agent and bonded off and removed from the Property and Improvements, within thirty (30) days of its creation, in a manner satisfactory to Agent;

(d)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, leases and contracts (other than for money borrowed or for credit received with respect to property acquired) entered into in the ordinary course of business as presently conducted or to secure obligations for surety or appeal bonds; and

(e)     Liens upon the Operator's accounts subject to the AR Intercreditor Agreement.

5.3     Merger, Consolidation, Etc.  Except as otherwise provided in the Security Instrument, consummate or suffer or permit Operator to consummate any merger, consolidation or similar transaction, or sell, assign, lease or otherwise dispose of substantially all of its assets (whether now or hereafter acquired), without the prior written consent of the Agent, which consent may be granted or refused in Agent's sole discretion.

5.4     Maintain Single-Purpose Entity Status.

(a)     Dissolve or terminate or materially amend, or suffer, permit, tolerate or allow Operator to dissolve or terminate or materially amend, the terms of its certificate of incorporation, articles of organization, operating agreement or partnership agreement or by-laws, as applicable, the terms of which require Borrower and Operator to be a Single-Purpose Entity;

74561574v.6

(b)     at any time own any encumbered asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

(c)     at any time be engaged directly or indirectly, in any business other than the ownership, management and operation of the Property;

(d)     incur, create or assume any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the Loan, (ii) Permitted AR Financing, (iii) the CARES Act Obligations set forth on Schedule 3.31, and (iv) Indebtedness which represents trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Property; none of which shall be secured (senior, subordinate or *pari passu*) by the Property;

(e)     become insolvent or fail to pay its debts from its assets as the same shall become due;

(f)     fail to do all things necessary to preserve Borrower's or Operator's existence as a Single-Purpose Entity, and will not, nor will any partner, limited or general, member or shareholder thereof, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of organization, operating agreement, articles of incorporation or by-laws in a manner which adversely affects the Borrower's or Operator's existence as a Single-Purpose Entity;

(g)     fail to maintain books and records and bank accounts separate from those of its Affiliates, including its members, general partners or shareholders, as applicable;

(h)     fail to at all times hold itself out to the public as a legal entity separate and distinct from any other entity (including any Affiliate thereof, including the general partner or any member or shareholder of the Borrower or any Affiliate of the general partner or any member or shareholder of the Borrower, as applicable);

(i)     fail to file its own tax returns; or

(j)     fail to maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

5.5     Change of Business. Make any material change in the nature of its business as it is being conducted as of the date hereof.

5.6     Changes in Accounting. Change, or suffer, permit, tolerate or allow Operator to change, its methods of accounting, unless such change is permitted by GAAP, and provided such change does not have the effect of curing or preventing what would otherwise be an Event of Default or Default had such change not taken place.

5.7     ERISA Funding and Termination. In the event that Borrower becomes the licensed operator of the Facility, permit (a) the funding requirements of ERISA with respect to any employee plan to be less than the minimum required by ERISA at any time, or (b) any employee plan to be subject to involuntary termination proceedings at any time.

5.8     Transactions with Affiliates. Enter into any transaction with a Person which is an

56

74561574v.6

Affiliate of Borrower other than in the ordinary course of its business and on fair and reasonable terms no less favorable to Borrower, than those they could obtain in a comparable arms-length transaction with a Person not an Affiliate.

5.9     Transfer of Property or any Ownership Interests.  Except with respect to a Permitted Transfer, Borrower shall not:  (a) permit or suffer the Transfer of any of the Stock or ownership interests of Operator or Borrower or (b) permit or suffer any other Transfer.

5.10    Change of Use.  Alter or change, or suffer, permit, tolerate or allow Operator to alter or change, the use of the Facility or permit the termination or amendment of any management agreement for the Facility or enter into any Lease (except for any residency agreements) for the Facility, unless Borrower first notifies Agent and provides Agent a copy of the proposed lease agreement or management agreement, obtains Agent's written consent thereto, which consent may be withheld for any reason or for no reason whatsoever in Agent's sole and absolute discretion, and obtains and provides Agent with a subordination agreement in form satisfactory to Agent, as determined by Agent in its sole discretion, from such Manager or Operator subordinating to all rights of Agent.

5.11    Place of Business.  Change, or suffer, permit, tolerate or allow Operator to change, its chief executive office or its principal place of business without first giving Agent at least thirty (30) days prior written notice thereof and promptly providing Agent such information and amendatory financing statements as Agent may request in connection therewith.

5.12    Acquisitions.  Directly or indirectly, purchase, lease, manage, own, operate, or otherwise acquire, or suffer, permit, tolerate or allow Operator to purchase, lease, manage, own, operate, or otherwise acquire, any property or other assets (or any interest therein) which are not used in connection with the operation of the Property and Improvements or the Facility.

5.13    Dividends, Distributions and Redemptions.  As long as any Event of Default exists, or if any Event of Default would result from a distribution, Borrower shall not, nor shall Borrower suffer or permit Operator to, declare or pay any distributions to its shareholders, members or partners, as applicable, or purchase, redeem, retire, or otherwise acquire for value, any Stock or ownership interests in Borrower or Operator now or hereafter outstanding, return any capital to its shareholders, members or partners as applicable, or make any distribution of assets to its shareholders, members or partners, as applicable. Borrower shall not, nor shall Borrower suffer or permit Operator to, declare or pay any dividends or other distributions if on such date any CARES Act Obligations remain outstanding such that they have not been indefeasibility paid in full or forgiven pursuant to Section 1106 of the CARES Act.

5.14    Conduct of Business.  Borrower shall not conduct, or permit Operator to conduct, the operation of the Facility in a manner inconsistent with the level of operation of the Facility as of the date hereof, including without limitation, the following:

(A)     Fail to maintain the standard of care for the patients of the Facility at all times at a level necessary to ensure quality care for the patients of the Facility in accordance with customary and prudent industry standards;

74561574v.6

(B)    Fail to operate the Facility in a prudent manner and in compliance in all material respects with applicable laws and regulations relating thereto and fail to cause all Permits, Reimbursement Contracts, and any other agreements necessary for the use and operation of the Facility or as may be necessary for participation in the Medicaid, Medicare, or other applicable reimbursement programs to remain in effect without reduction in the number of licensed beds authorized for use in the Medicaid, Medicare, or other applicable reimbursement programs;

(C)    Fail to maintain sufficient Inventory and Equipment of types and quantities at the Facility to enable Operator adequately to perform operations of the Facility;

(D)    Fail to keep all Improvements and Equipment located on or used or useful in connection with the Facility in good repair, working order and condition, reasonable wear and tear excepted, and from time to time and fail to make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good operating condition;

(E)    Fail to keep all required Permits and insurance coverage current and in full force and effect; and

(F)    Fail to correct any deficiency by the date required by the applicable licensure and certification agency, if such deficiency could adversely affect either: (i) the right to continue participation in Medicare and Medicaid for existing patients; or (ii) the right to admit new Medicare and Medicaid patients; or (iii) the right to continue operating the Facility as a skilled nursing facility.

5.15    Borrower shall not, nor shall Borrower permit Operator to amend, restate, supplement, waive or otherwise modify the Cares Act PPP Loan if the effect of such amendment, supplement, waiver or other modification would be adverse to Agent and Lenders.

## ARTICLE VI
## ENVIRONMENTAL HAZARDS

6.1    <u>Prohibited Activities and Conditions</u>.  Borrower shall not cause or permit, or suffer or permit Operator to cause, permit or suffer, any of the following:

(a)    The presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials in, on, under, at or from the Property or any Improvements;

(b)    The transportation of any Hazardous Materials to, from, or across the Property,

(c)    Any occurrence or condition on the Property or in the Improvements or any other property of Borrower that is adjacent to the Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(d)    Any material violation of or noncompliance with the terms of any Environmental Permit with respect to the Property, the Improvements or any property of Borrower that is adjacent to the Property.

58

74561574v.6

The matters described in clauses (a) through (d) above are referred to collectively in this Article VI as "<u>Prohibited Activities and Conditions</u>" and individually as a "<u>Prohibited Activity and Condition</u>."

6.2     <u>Exclusions</u>.  Notwithstanding any other provision of Article VI to the contrary, "Prohibited Activities and Conditions" shall not include the safe and lawful use and storage of quantities of: (a) pre-packaged supplies, medical waste, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable facilities; (b) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by occupants of the Facility; and (c) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Property's parking areas or used to maintain or repair the Property or Improvements, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

6.3     <u>Preventive Action</u>.  Borrower shall take all appropriate steps (including the inclusion of appropriate provisions in the Lease Agreement approved by Agent which are executed after the date of this Agreement) to prevent its employees, agents, contractors, tenants and occupants of the Facility from causing or permitting any Prohibited Activities and Conditions.

6.4     <u>O&M Program Compliance</u>.  Borrower shall implement and comply with the O&M Program, as applicable, in a timely manner, and cause all employees, agents, and contractors of Borrower and any other persons present on the Property to comply with the O&M Program.  All costs of performance of Borrower's obligations under any O&M Program shall be paid by Borrower, and Agent and Lenders' out-of-pocket costs incurred in connection with the monitoring and review of the O&M Program and Borrower's performance shall be paid by Borrower upon demand by Agent.  Any such out-of-pocket costs of Agent and Lenders which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

6.5     <u>Borrower's Environmental Representations and Warranties</u>.  Except as disclosed in the Phase 1 Environmental Report prepared by Tetra Tech, dated August 11, 2021 and provided to Agent, Borrower represents and warrants to Agent and Lenders that:

(a)     Borrower has not at any time caused or permitted any Prohibited Activities and Conditions;

(b)     To the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities and Conditions exist with respect to the Facility;

(c)     Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.  Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Facility, Property and the Improvements in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect.  To the best of Borrower's knowledge after reasonable and diligent inquiry, no event has occurred or condition exists with respect to the Facility, Property and/or Improvements that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with any Hazardous Materials Law or the terms of any Environmental Permit;

59

74561574v.6

(d)    There are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge, threatened that involves the Facility, Property and/or the Improvements or allege, arise out of, or relate to any Prohibited Activity, and Condition;

(e)    Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Facility, Property, the Improvements or any other property of Borrower that is adjacent to the Property.  The representations and warranties in this Article VI shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan evidenced by the Note, and shall survive until and after the Loan Obligations have been paid in full.

6.6    <u>Notice of Certain Events</u>.  Borrower shall promptly notify Agent in writing of any and all of the following that may occur:

(a)    Borrower's or Operator's discovery of any Prohibited Activity and Condition;

(b)    Borrower's or Operator's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other Person with regard to present, or future alleged violations of Hazardous Materials Law, Prohibited Activities and Conditions or any other environmental, health or safety matters affecting the Property, the Improvements or any other property of Borrower that is adjacent to the Property;

(c)    Any representation or warranty in this Article VI or the Environmental Indemnity Agreement which becomes untrue at any time after the date of this Agreement;

(d)    Any decision by the SBA that any and/or all of the CARES Act PPP Loan has been forgiven, and/or (B) any and/or all of the CARES Act PPP Loan will not be forgiven;

(e)    Any decision by HHS or other Governmental Authority that any portion of the CARES Act Provider Relief Debt must be repaid; and/or

(f)    Any notification from the SBA or the CARES Act PPP Loan lender or any other Governmental Authority that there has been a default with respect to the CARES Act PPP Loan or the occurrence of any event or condition that results in the CARES Act PPP Loan becoming due prior to its scheduled maturity or that enables or permits the holder or holders thereof to declare the CARES Act PPP Loan to be due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity.

Any such notice given by Borrower shall not relieve Borrower or any other Person of, or result in a waiver of, any obligation under this Agreement, the Note, or any of the other Loan Documents.

6.7    <u>Costs of Inspection</u>.  Borrower shall pay promptly the costs of any environmental inspections, tests or audits required by Agent in connection with any foreclosure or deed in lieu of foreclosure, or, if required by Agent, as a condition of Agent's consent to any "Transfer", or required by Agent following a reasonable determination by Agent that Prohibited Activities and

74561574v.6

Conditions may exist. Any such costs incurred by Agent and Lenders (including the reasonable fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Loan Obligations.

6.8 <u>Remedial Work</u>. If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("<u>Remedial Work</u>") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Property, the Improvements or the use, operation or improvement of the Property under any Hazardous Materials Law, Borrower shall, by the earlier of (a) the applicable deadline required by Hazardous Materials Law or (b) thirty (30) days after notice from Agent demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete such work by the time required by applicable Hazardous Materials Law. If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Agent may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Agent and Lenders on demand for the cost of doing so. Any reimbursement due from Borrower to Agent and Lenders shall become part of the Loan Obligations.

6.9 <u>Cooperation with Governmental Authorities</u>. Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any Hazardous Materials Law or any alleged Prohibited Activity and Condition.

6.10 <u>Indemnity</u>.

(a) Borrower and Guarantor shall hold harmless, defend and indemnify: (i) Agent, (ii) Lenders; (iii) any subsequent owner or holder of any interest in the Note; (iv) the officers, directors, partners, agents, shareholders, employees and trustees of any of the foregoing; and (iv) the heirs, legal representatives, successors and assigns of each of the foregoing (together, the "<u>Indemnitees</u>") against all proceedings, claims, damages (including punitive damages to the extent awarded to a third party), losses, liabilities, expenses, penalties, costs, fines, encumbrances, liens, judgments, assessments, obligations or settlement payments (whether initiated or sought by any Governmental Authority or private parties), including reasonable fees and expenses of attorneys, expert witnesses and Remedial Work, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(A) Any breach of any representation or warranty of Borrower or any other Loan Party, as applicable, in this Article VI or the Environmental Indemnity Agreement;

(B) Any failure by Borrower or any other Loan Party, as applicable, to perform any of their obligations under this Article VI or the Environmental Indemnity Agreement;

(C) The existence or alleged existence of any Prohibited Activity and Condition;

(D) The presence or alleged presence of Hazardous Materials in, on, around or under the Property, the Improvements or any property of Borrower that is adjacent to the Property; or

61

(E)    Compliance with or actual or alleged violation of any Hazardous Materials Law.

(b)    Counsel selected by Borrower to defend Indemnitees shall be subject to the reasonable approval of those Indemnitees, which approval shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding anything contained herein, any Indemnitee may elect to defend any claim or legal or administrative proceeding at the Borrower's expense if such Indemnitee has reason to believe that its interests are not being adequately represented or diverge from other interests being represented by such counsel (but Borrower shall be obligated to bear the expense of at most only one such separate counsel).  Nothing contained herein shall prevent an Indemnitee from employing separate counsel in any such action at any time and participating in the defense thereof at its own expense.

(c)    Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "Claim") settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Agent and each Lender of a written release of those Indemnitees, satisfactory in form and substance to Agent; or (ii) may materially and adversely affect any Indemnitee, as determined by such Indemnitee in its sole discretion.

(d)    The liability of Borrower to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any other Loan Party to receive notice of or consideration for any of the following:

(i)    Any amendment or modification of any Loan Document;

(ii)    Any extensions of time for performance required by any of the Loan Documents;

(iii)    The accuracy or inaccuracy of any representations and warranties made by Borrower under this Agreement or any other Loan Document;

(iv)    The release of Borrower or any other Person, by Agent or any Lender or by operation of law, from performance of any obligation under any of the Loan Documents; and

(v)    The release or substitution in whole or in part of any security for the Loan Obligations.

(e)    Borrower shall, at its own cost and expense, do all of the following:

(i)    Pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement;

74561574v.6

(ii)    Reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Article VI or the Environmental Indemnity Agreement; and

(iii)    Reimburse Indemnitees for any and all expenses, including reasonable fees and costs of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Article VI or the Environmental Indemnity Agreement, or in monitoring and participating in any legal or administrative proceeding.

(f)    In any circumstances in which the indemnity under this Article VI applies, Agent and each Lender may, if it deems it reasonably necessary, employ its own separate legal counsel and consultants to prosecute, defend or negotiate any Claim or legal or administrative proceeding and Agent and each Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any Claim or legal or administrative proceeding.  Borrower shall reimburse Agent and Lenders upon demand for all costs and expenses incurred by Agent and each Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys and consultants.

(g)    The provisions of this Article VI shall be in addition to any and all other obligations and liabilities that Borrower may have under the applicable law or under the other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Article VI without regard to whether Agent, Lender or that Indemnitee has exercised any rights against the Property and/or any Improvements or any other security, pursued any rights against any Indemnitee, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one person or entity, the obligation of those persons or entities to indemnify the Indemnitees under this Article VI shall be joint and several.  The obligations of Borrower to indemnify the Indemnitees under this Article VI shall survive any repayment or discharge of the Loan Obligations, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of the Security Instrument.

ARTICLE VII
PAYMENT RESERVES

7.1    Establishment of Payment Reserves.  Borrower understands and agrees that, notwithstanding the establishment of the Payment Reserves as herein required, all of the proceeds of the Loan have been, and shall be considered, fully disbursed and shall bear interest and be payable on the terms provided in the Loan Documents. Agent shall have the right, in its good faith credit judgment and discretion, to establish and fund reserves related to any CARES Act Deferred Payroll Taxes, CARES Act PPP Loan, CARES Act Provider Relief Debt or Medicare Accelerated Payment or any other amounts owed by Operator pursuant to similar stimulus programs.

7.2    Required Repair Reserve.  Borrower shall perform or cause Operator to perform all of the repairs or replacements to the Property as more particularly set forth on Exhibit E (the "Required Repairs").  The Required Repairs shall be completed in a good and workmanlike manner on or before the "completion date" if any, set forth on Exhibit E for the particular item of the Required Repairs.  On the Closing Date, Borrower shall deposit with Agent the amounts set

63

forth on Exhibit E to perform the Required Repairs. Amounts so deposited with Agent are referred to as the "Required Repair Reserve". If the Required Repairs are not completed when and as provided under this Agreement, or upon the occurrence and during the continuation of an Event of Default, Agent at its option, in addition all other rights and remedies of Agent under this Agreement or other Loan Documents, may withdraw all funds in the Required Repair Reserve and apply such funds either to completion of the Required Repairs or towards payment of the Loan Obligations in such order, proportion and priority as Agent may determine in its sole discretion.

7.3     Replacement Reserve. Borrower shall pay to Agent, for the benefit of the Lenders, on the first day of each month, one-twelfth of the annual amount per bed set forth on Exhibit G (the "Replacement Reserve Monthly Deposit"), which is the amount estimated by Agent in its sole discretion to be due for replacements and repairs required to be made to the Property. Amounts so deposited are referred to as the "Replacement Reserve". Agent may reassess its estimate of the amount necessary for the Replacement Reserve from time to time (but no more than once per calendar year) and increase the monthly amounts required to be deposited into Replacement Reserve upon 30 days written notice to Borrower if Agent determines in its reasonable discretion that an increase is necessary to maintain the proper maintenance and operation of the Property.

7.4     Disbursements from the Required Repair Reserve and the Replacement Reserve.

(a)     So long as no default or Event of Default exists and except as may be otherwise provided in this Agreement or other Loan Documents, Agent shall, to the extent funds are available in the Required Repair Reserve make disbursements to the Property from the Required Repair Reserve to or for the benefit of the Borrower to reimburse the Borrower for the Required Repairs and, make disbursements from the Replacement Reserve upon Borrower's written request, as provided in Section 7.4(b)(ii) below.

(b)     Agent shall have no obligation to disburse any amount from the Required Repair Reserve or the Replacement Reserve unless the following additional conditions are satisfied:

(i)     Agent receives a written request from Borrower for the applicable disbursement from the Required Repair Reserve or the Replacement Reserve and a certification by Borrower in a form acceptable to Agent that the applicable item of repair and/or replacement has been completed;

(ii)     The delivery to Agent by Borrower of invoices, receipts, or other evidence satisfactory to Agent verifying the cost of performing the repair, the replacement, or completing the applicable work, or otherwise evidencing the obligation to be paid;

(iii)     To the extent applicable, the delivery to Agent of affidavits, lien waivers, and other evidence reasonably satisfactory to Agent showing that all materialmen, laborers, subcontractors, and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished labor, material, or equipment to the Property have been paid all amounts due for labor, materials or equipment furnished to said Property; and

(iv)     Such other terms and conditions as may be provided in this Agreement or which are reasonably required by Agent.

64

74561574v.6

7.5    Reserved.

7.6    Reserved.

7.7    Reserved.

7.8    Debt Reserve.

(a)    On the Closing Date, if applicable, Borrower shall deposit with Agent, for the purposes of establishing a Debt Reserve for purposes of the payment of the Debt and satisfaction of the Loan Obligations, the amount set forth on Exhibit G, to be held as Collateral for the payment of the Debt and satisfaction of the Loan Obligations.  Amounts so deposited are referred to as the "Debt Reserve".

(b)    The Debt Reserve shall be disbursed by the Agent and applied to the Debt and other Loan Obligations as determined by Agent during the Term of the Loan.  Upon payment of the Debt and satisfaction of all other Loan Obligations of Borrower under the Loan Documents, to the extent not disbursed, the Debt Reserve, including any interest earned thereon, shall be refunded to Borrower.

7.9    Security Interest in Payment Reserves.

(a)    Agent or its assignee may either hold the Payment Reserves in a separate account or accounts at CFG Community Bank or another depository institution or trust company determined by Agent in its sole discretion.  Borrower shall not be entitled to interest on any part of the Payment Reserves.  As additional security for the payment and performance by Borrower of the Loan Obligations, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Agent, and hereby grants to Agent and Lenders, a security interest in (A) the Payment Reserves, (B) the depository or other accounts into which the Payment Reserves have been deposited, (C) all insurance on said accounts, (C) all accounts, contract rights, and general intangibles or other rights and interests pertaining thereto, (E) all sums now or hereinafter therein or represented thereby, (F) all replacements, substitutions or proceeds thereof, (G) all instruments and documents, now or hereafter evidencing the Payment Reserves or such accounts, (H) all powers, options, rights, privileges, and immunities pertaining to the Payment Reserves (including the right to make withdrawals therefrom), and (I) all proceeds of the foregoing.  Borrower hereby expressly authorizes and consents to the accounts into which the Payment Reserves have been deposited being held in Agent's name or the name of any entity servicing the Note for Agent, and hereby acknowledges and agrees that Agent, or at Agent's election, such servicing agent, shall have exclusive control over said accounts.  Notice of the assignment and security interest granted to Agent and Lenders herein may be delivered by Agent at any time to the financial institution wherein the Payment Reserves have been established, and Agent, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts.  Borrower hereby assumes all risk of loss with respect to amounts on deposit in the Payment Reserves.  Borrower shall execute and deliver such account control agreements as may be required by Agent to perfect Agent's lien on and security interest in the Payment Reserves.

(b)    Upon an Event of Default, Agent may, but shall not be obligated to, apply

65

74561574v.6

at any time the balance then remaining in the Payment Reserves against the Loan Obligations in whatever order Agent shall determine in Agent's sole and absolute discretion. To the extent Agent withdraws any funds from the Payment Reserves as a result of Borrower's Default, Borrower shall replenish the Payment Reserves within fourteen (14) days of Agent's demand. No such application of the Payment Reserves by Agent shall be deemed to cure any Default or Event of Default hereunder, and any such application shall not limit Borrower's obligation to deposit any deficiency of which Agent gives notice. Upon full payment and performance of the Loan Obligations and in accordance with its terms or at such earlier time as Agent may elect, the balance of the Payment Reserves then in Agent's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

(c)    Borrower hereby knowingly, voluntarily, and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Payment Reserves as set forth herein is at Borrower's direction and is not the exercise by Agent of any right of set off or other remedy upon an Event of Default. Borrower hereby waives all right to withdraw funds from the Payment Reserves, and all rights to receive disbursements from the Payment Reserves except in compliance with the Loan Documents.

(d)    Upon an Event of Default, Agent may, without notice or demand (it being expressly agreed by Borrower that Borrower is waiving any notice of acceleration and intent to accelerate) on Borrower, at its option (i) withdraw any and all funds (including, without limitation, interest) then remaining in the Payment Reserves and apply the same, after deducting all reasonable costs and expenses of safekeeping, collection, and delivery (including, but not limited to, reasonable attorneys' fees, costs, and expenses) to the Loan Obligations in such manner as Agent shall determine in its sole and absolute discretion, (ii) exercise any and all rights and remedies of a secured party under the applicable Uniform Commercial Code, and/or (iii) exercise any other remedies available at law or in equity.

The exercise of any or all of Agent's right to initiate and complete a judicial or non-judicial foreclosure under the Security Instrument shall not preclude its exercise of its rights under this Article VII.

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

8.1    Events of Default. The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder:

(a)    Borrower's failure to pay the entire amount of the Debt and other Loan Obligations on or before the Maturity Date; or

(b)    Borrower's failure to pay on or before the sixth (6th) day of the month, for credit to the Loan, any regularly scheduled monthly installment of principal or interest (other than the amount payable on the Maturity Date) that is payable on the first day of the month pursuant to this Agreement or any Loan Document; or

(c)    The failure to pay when due, any Taxes, insurance premiums or payment of money (other than as provided in Section 8.1(a) or (b)) required by the Note, this Agreement, the

66

Security Instrument, or any of the other Loan Documents or owed to the Agent or any Lender by Borrower; or

(d)    Dissolution or a change in composition of any Loan Party (including without limitation any Transfer not expressly permitted in the this Agreement, the Security Instrument or any of the other Loan Documents, or any failure to furnish to Agent financial statements and other information required by Section 4.6 when due; or

(e)    The failure of any Loan Party to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in Section 8.1(a), (b), (c) or (d) ), which can be cured with the payment of money, within fifteen (15) days after notice from Agent; or

(f)    The failure of any Loan Party to perform or keep or abide by any term, covenant or term, covenant or condition of any of the Loan Documents (other than as set forth in Section 8.1(a), (b), (c) or (d)), that cannot be cured with the payment of money (but is otherwise susceptible of curing), within thirty (30) days after notice from Agent, provided that if such failure cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure within such thirty(30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such failure, it being agreed that no such extension shall be for a period in excess of sixty (60) days; or

(g)    the filing of a bankruptcy proceeding, assignment for the benefit of creditors, issuance of a judgment in excess of $250,000.00 hereafter awarded against any Loan Party by any court of competent jurisdiction that remains unsatisfied or otherwise in force and effect for a period of sixty (60) days after the date of such award and the enforcement of said judgment against the assets of any Loan Party has not been stayed by an order of a court of competent jurisdiction, execution, garnishment, or levy against, or the appointment of a representative of any kind for the commencement of any proceeding for relief from indebtedness by or against any Loan Party; or

(h)    Intentionally Deleted;

(i)    if any written representation, covenant or warranty made to the Agent or any Lender by any Loan Party is breached or is untrue in any material respect when made; or

(j)    Intentionally Deleted;

(k)    failure to timely provide any financial information on request or to permit an examination of books and records, after the expiration of all notice, grace or cure periods, if any, set forth in the Loan Documents; or

(l)    the Borrower shall convey, transfer or otherwise divest itself of title to the Property; or

(m)    the Borrower shall encumber the Property or the Property with any secondary financing, without the prior written approval of Agent which approval may be granted or withheld for any reason or for no reason whatsoever in Agent's sole and absolute discretion; or

67

(n)    if at any time while the Loan remains outstanding, the revocation or suspension of an Operator's or a Borrower's Certificate of Need (if required), Facility License, the Medicaid or Medicare provider agreements or any other Permit or Reimbursement Contract necessary to operate the Facility; or

(o)    fraud or material misrepresentation or material omission by any Loan Party, any of their respective officers, directors, trustees, members, general partners or managers or any Loan Party in connection with (1) the application for or creation of Loan Obligations, (2) any financial statement, financial report, certification, or other report or information required under this Loan Agreement required to be provided to Agent during the term of Loan Obligations; or

(p)    if Borrower or any Operator incurs additional Indebtedness without the prior written approval of the Agent, or

(q)    a default by Borrower on any other obligations owed by them to Agent or any Lender; or

(r)    the occurrence of any material adverse change in the financial condition or prospects of any Loan Party or the existence of any other condition which, in Agent's reasonable determination, constitutes a material impairment of any such Person's ability to operate the Facility or of such Person's ability to perform their respective obligations under the Loan Documents, which is not remedied within thirty (30) days after written notice; or

(s)    the occurrence of any "Reportable Event" under ERISA which Agent determines in good faith constitutes grounds for imposition of liability against Borrower under Section V, Subtitle D of ERISA; or

(t)    the failure to satisfy any of the Financial Covenants; or

(u)    if Borrower or Operator or any lessee of the Property should be assessed fines or penalties in excess of $150,000 in the aggregate in any calendar year or on more than two separate occasions by any Governmental Authority with jurisdiction over the Facility; or

(v)    the receipt by Agent or any Lender of a written notice from Borrower or any other party that was sent with the intention of terminating, limiting or restricting the indebtedness secured by the Security Instrument.

Notwithstanding anything in this Section, all requirements of notice shall be deemed eliminated if Agent or any Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of Default rather than from the date of notice.

8.2    Remedies. Upon the occurrence of any one or more of the foregoing Events of Default, Agent or any Lender may, at its option:

(a)    Declare the entire unpaid principal and accrued but unpaid interest of the Loan Obligations to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind (including, without limitation, notice of acceleration and notice of intent to accelerate), all of which are hereby expressly waived;

68

74561574v.6

provided, however, that immediately upon an Event of Default resulting from bankruptcy or other insolvency proceeding, the Loan Obligations shall automatically and immediately be due and payable in full; and/or

(b)     Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any covenant or condition contained in this Agreement; and/or

(c)     Exercise any and all rights and remedies afforded by the laws of the United States, the states in which the Property or other Collateral is located or any other appropriate jurisdiction as may be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Agreement and the Loan Documents; and/or

(d)     Exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account and other property of Borrower which is in the possession of Agent or any Lender or any Person who then owns a participating interest in the Loan, to the extent of the full amount of the Loan; and/or

(e)     Exercise its rights and remedies pursuant to any of the Loan Documents.

Any failure of Agent or any Lender to make any election of remedies following an Event of Default shall not constitute a waiver of Agent's or any Lender's right to make the election in the event of any subsequent Event of Default.

8.3     Costs of Collection and Enforcement.  Borrower agrees to pay (a) all reasonable attorneys' fees and other costs and expenses of any nature incurred by Agent and each Lender in connection with this Agreement or the enforcement of Agent's or any Lender's rights and remedies under the Loan Documents, including reasonable attorneys' fees incurred by Agent and each Lender for legal advice concerning Agent and each Lender's rights and remedies (whether or not an Event of Default in fact occurs, and whether or not any remedies are in fact exercised); (b) all reasonable attorneys' fees, as determined by the court, and all other costs, expenses and fees incurred by Agent and each Lender in connection with any suit or proceeding instituted to collect the Loan Obligations or to enforce Agent's and each Lender's rights and remedies under the Loan Documents, whether or not such suit or proceeding is prosecuted to judgment or conclusion; (c) all reasonable attorneys' fees and other costs and expenses incurred by Agent and each Lender in connection with any bankruptcy, insolvency or reorganization proceeding or receivership involving Borrower or any affiliate of Borrower, including any guarantor, and including all reasonable attorneys' fees incurred in making any appearances in any such proceeding or in seeking relief from any stay or injunction issued in or arising out of any such proceeding; and (d) all reasonable attorneys' fees and other costs and expenses incurred in any appellate proceedings and any post-judgment proceedings to collect or enforce the judgment.

8.4     Offsets.  No indebtedness shall be deemed to have been offset or shall be offset or compensated by all or part of any claim, cause of action, counterclaim or cross-claim, whether liquidated or unliquidated, which Borrower now or hereafter may have or may claim to have against Agent or any Lender.  Furthermore, in respect to the present indebtedness of, or any future indebtedness incurred by, Borrower to Agent or any Lender, Borrower waives, to the fullest extent

74561574v.6

permitted by law, the benefits of any applicable law, regulation, or procedure which substantially provides that, where cross-demands for money have existed between persons at any point in time when neither demand was barred by the applicable statute of limitations, and an action is thereafter commenced by one such person, the other may assert in his answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the claim would at the time of filing the answer be barred by the applicable statute of limitations. This Agreement and the other Loan Documents are not subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense as against Agent or any Lender, including, without limitation, any assignee of Agent or any Lender, including the defense of usury, and the operation of any of the terms of the Loan, or the exercise of any right thereunder, will not render the Loan unenforceable, in whole or in part, or subject to any right of rescission, set-off, abatement, diminution, counterclaim or defense, including the defense of usury and whether or not such rescission, set-off, abatement, diminution, counterclaim or other defense arises out of or relates to the Loan Documents or any agreement between Borrower, Agent or any Lender or any affiliate of Agent or any Lender, and Capital Funding Group, Inc., a Maryland corporation ("CFG") with respect to any obligation or commitment of or by CFG to make a Loan to Borrower insured by the U.S. Department of Housing and Urban Development Federal Housing Administration ("HUD") under the provisions of Section 232 of the National Housing Act, and the Regulations thereunder.

ARTICLE IX
EXIT FEE

9.1    Exit Fee.

(a)    As used in this Agreement, "Exit Fee" means, with respect to the Property, the amount set forth on Exhibit H.

(b)    Borrower shall pay the Exit Fee to Agent, for the benefit of Agent, on demand in any of the following events: (i) Agent delivers a commitment for a HUD Financing for the Property consistent with the HUD Contract or as otherwise provided in this Agreement and Borrower does not accept the HUD Financing, or (ii) Borrower has defaulted in its obligation to cooperate with Agent to obtain the HUD Financing for the Property as provided in Section 4.14, or (iii) the HUD Lender is unable to obtain a commitment for the HUD Financing for the Property on account of any matter not within the control of the HUD Lender, including, without limitation, any material negative or adverse change in the financial condition of Borrower or Operator or any Manager of the Facility, any lien, pending or threatened litigation or other event effecting the Property or the Borrower or any Operator which causes the Property, Borrower, Operator or the Facility not to be eligible for a HUD Financing, or (iv) in the event Borrower repays the Loan other than as a result of a HUD Financing, in which event the Exit Fee shall be payable.

ARTICLE X
MISCELLANEOUS

10.1    Waiver. No remedy conferred upon, or reserved to, Agent or any Lender in this Agreement or any of the other Loan Documents is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity. Exercise of or omission

70

74561574v.6

to exercise any right of Agent or any Lender shall not affect any subsequent right of Agent or any Lender to exercise the same. No course of dealing between Borrower and Agent or any Lender or any delay on Agent's or any Lender's part in exercising any rights shall operate as a waiver of any of Agent's or any Lender's rights. No waiver of any Default under this Agreement or any of the other Loan Documents shall extend to or shall affect any subsequent or other then existing Default or shall impair any rights, remedies or powers of Agent or any Lender. If Borrower consists of more than one person or entity, each such person or entity shall be jointly and severally liable for the performance of each of the obligations of Borrower to Lenders hereunder.

10.2    Costs and Expenses. Borrower will bear all taxes, fees and expenses (including actual reasonable attorneys' fees and expenses of counsel for Agent and Lenders) in connection with the Loan, the Note, the preparation of this Agreement and the other Loan Documents (including any amendments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents. If, at any time, an Event of Default occurs or Agent or any Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Loan Obligations or its rights under this Agreement or any of the Loan Documents, or if Agent or any Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral and as a result of any of the foregoing, Agent or any Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Loan Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral, Borrower, or to protect, collect, or liquidate any of the security for the Loan Obligations, or attempt to enforce any security interest or lien granted to Agent or any Lender by any of the Loan Documents, then in any such events, all of the actual reasonable attorney's fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto shall constitute additional obligations of Borrower to Agent or any Lender payable on demand of Agent or any Lender. Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Loan Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fail to do so, Borrower agrees to reimburse Agent and each Lender for the amounts paid by Agent and each Lender, together with penalties or interest, if any, incurred by Agent and each Lender as a result of underpayment or nonpayment. Such amounts shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

10.3    Performance of Agent and Lenders. At its option, upon Borrower's failure to do so, Agent or any Lender may make any payment or do any act on Borrower's behalf that Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse Agent and each Lender, on demand, for any payment made or expense incurred by Agent or such Lender pursuant to the foregoing authorization, including, without limitation, reasonable attorneys' fees, and until so repaid any sums advanced by Agent or any Lender shall constitute a portion of the Loan Obligations, shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid.

74561574v.6

10.4    Indemnification.  Borrower shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties (as defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) imposed upon or incurred by or asserted against Agent or any Lender by reason of:  (a) ownership of the Note, the Security Instrument, the Property, or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Loan Obligations and/or any of the Loan Documents; (c) any and all lawful action that may be taken by Agent or Lenders in connection with the enforcement of the provisions of the Security Instrument, or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, Operator, or Manager and/or any partner, joint venturer, member or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower, Operator, or Manager to perform or comply with any of the terms of this Agreement or any of the other Loan Documents; (g) any claims by any broker, person or entity claiming to have participated in arranging the making of the Loan evidenced by the Note; (h) any failure of the Property to be in compliance with any applicable laws; (i) any and all claims and demands whatsoever which may be asserted against Agent or any Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in a Lease or any replacement or renewal thereof or substitution therefore; (j) performance of any labor or services or the furnishing of any materials or other property with respect to the Property, the Improvements or any part thereof; (k) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-b, statement for recipients of proceeds from real estate, broker and barter exchange transactions, which may be required in connection with the Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Loan is made; (l) any misrepresentation made to Agent or any Lender in this Agreement or in any of the other Loan Documents; (m) any tax on the making and/or recording of any of the Security Instrument, the Note or any of the other Loan Documents; (n) the violation of any requirements of the Employee Retirement Income Security Act of 1974, as amended; (o) any fines or penalties assessed or any corrective costs incurred by Agent and Lenders if the Facility or any part of the Property is determined to be in violation of any covenants, restrictions of record, or any applicable laws, ordinances, rules or regulations; or (p) the enforcement by any of the Indemnified Parties of the provisions of this Section 10.4.  The foregoing to the contrary notwithstanding, Borrower shall not have any obligation to indemnify an Indemnified Party under this Section 10.4 with respect to any liability that a court of competent jurisdiction finally determines to have resulted from the gross or willful misconduct of such Indemnified Person.  Any amounts payable to Agent and/or Lenders by reason of the application of this Section 10.4 shall become immediately due and payable, and shall constitute a portion of the Loan Obligations, shall be secured by any of the Security Instrument, and shall accrue interest at the Default Rate.  The obligations and liabilities of

Borrower under this Section 10.4 shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Security Instrument.  For purposes of this Section 10.4, the term "Indemnified Parties" means Agent, each Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by any of the Security Instrument is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, without limitation, any investor in any securities backed in whole or in part by the Loan) as well as the respective directors, officers, shareholder, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Security Instrument or as a part of or following a foreclosure of the Loan and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

10.5    Headings.  The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

10.6    Survival of Covenants.  All covenants, agreements, representations and warranties made herein and in certificates or reports delivered pursuant hereto shall be deemed to have been material and relied on by Agent and Lenders, notwithstanding any investigation made by or on behalf of Agent or Lenders, and shall survive the execution and delivery to Agent and Lenders of the Note and this Agreement.

10.7    Notices, etc.  Any notice or other communication required or permitted to be given by this Agreement or the other Loan Documents or by applicable law shall be in writing and shall be deemed received: (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below) with receipt acknowledged by the recipient thereof; (b) three (3) Business Days following the date deposited in U.S. mail, postage prepaid, certified or registered, with return receipt requested; or (c) one (1) Business Day following the date deposited with Federal Express or other national overnight carrier, and in each case addressed as follows:

| | |
|---|---|
| If to Borrower: | 525 Chestnut Street, Suite 102<br>Cedarhurst, NY 11516<br>Attention: Dov Green |
| with a copy to: | Benesch, Friedlander, Coplan & Aronoff LLP<br>200 Public Square, Suite 2300<br>Cleveland, Ohio 44114-2378<br>Attention: Daniel J. O'Brien |
| If to Agent: | Capital Funding, LLC<br>1422 Clarkview Road<br>Baltimore, Maryland  21209<br>Attention:  Account Manager - Liberty MO |

73

74561574v.6

with a copy to:        Seyfarth Shaw LLP
                    560 Mission Street, Suite 3100
                    San Francisco, California 94123
                    Attention:  Robin S. Freeman

Any party may change its or its attorney address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

10.8    Benefits and Information Sharing.  All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  No Person other than Borrower, Agent or each Lender shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.  Agent or Lenders may share with any Affiliates, any and all financial and other information about the Loan Parties obtained by Lender in connection with the Loan, and the Loan Parties hereby authorizes such information sharing.  Each of the Loan Parties acknowledges and agrees that such shared information may include "financial records" as defined in Section 1-301(c) of the Financial Institutions Article of the Code of Maryland.

10.9    Supersedes Prior Agreements; Counterparts.  This Agreement and the instruments referred to herein supersede and incorporate all representations, promises, and statements, oral or written, made by Borrower, Agent or any Lender in connection with the Loan.  This Agreement may not be varied, altered, or amended except by a written instrument executed by an authorized officer of Borrower, Agent and the Required Lenders.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, but such counterparts shall together constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including in pdf format) will be effective as delivery of a manually executed counterpart to this Agreement.  This Agreement and the other Loan Documents represent the final agreement between the parties with respect to the subject matter hereof and thereof.  There are no unwritten oral agreements between the parties.

10.10  Loan Agreement Governs.  The Loan is governed by terms and provisions set forth in this Agreement and the other Loan Documents and in the event of any irreconcilable conflict between the terms of the other Loan Documents and the terms of this Agreement, the terms of this Agreement shall control; provided, however, in the event there is any apparent conflict between any particular term or provision which appears in both this Agreement and the other Loan Documents and it is possible and reasonable for the terms of both this Agreement and the Loan Documents to be performed or complied with then (except with respect to the Maturity Date or any extension thereof, in which case this Agreement shall be controlling) notwithstanding the foregoing both the terms of this Agreement and the other Loan Documents shall be performed and complied with.

10.11  CONTROLLING LAW.  THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND AND THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE STATE OF MARYLAND, CITY OF BALTIMORE FOR THE ENFORCEMENT OF ANY AND ALL

74561574v.6

OBLIGATIONS UNDER THE LOAN DOCUMENTS EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT IT IS TO BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MARYLAND OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION.

10.12    WAIVER OF JURY TRIAL. BORROWER HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF AGENT, LENDERS AND/OR BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AGREES THAT AGENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER IRREVOCABLY TO WAIVE ITS RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF AGENT AND LENDERS TO MAKE THE LOAN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) AMONG BORROWER, AGENT AND LENDERS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

10.13    Management Agreement. Agent shall have the right in its sole and absolute discretion to approve any management company with respect to the management of the Facility. The management agreement will be assigned to Agent as additional security for repayment of the Loan and payment of all management fees shall be subordinate to the Loan. Agent shall have the further right to approve in its sole and absolute discretion any contract entered into by the Facility with any Affiliate of Borrower for the provisions of any services to the Borrower and/or the Facility. Any such ancillary service contract will be assigned to Agent as additional security for repayment of the Loan.

10.14    Patriot Act Compliance.

(a)    Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism. Agent shall have the right to audit the Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism. In the event that the Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then Agent may, at its option, cause the Borrower to comply therewith and any and all reasonable costs and expenses incurred by Agent and Lenders in connection

75

74561574v.6

therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable. For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)    Neither the Borrower nor any partner, member, shareholder or other constituent (each a "Constituent of Borrower") or a partner, member or shareholder of a Constituent of Borrower nor any owner of a direct or indirect interest in the Borrower (i) is listed on any Government Lists (as defined below), (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (iv) is not currently under investigation by any governmental authority for alleged criminal activity. For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (i) the criminal laws against terrorism; (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or the (v) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Agent notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Agent notified Borrower in writing is now included in "Governmental Lists".

10.15  Secondary Market Transactions.

(a)    Borrower hereby acknowledges that Lenders may, with Agent's prior written consent (which consent is not required for transfers of the Loan made in accordance with Section 11.17(a)(i)), in one or more transactions (i) sell, or otherwise transfer the Loan or any portion thereof (or undivided ownership interests therein) one or more times (ii) sell participation interests in the Loan one or more times, (iii) further divide or re-divide the Loan into two or more separate loans, notes or components which may take the form of senior/junior/mezzanine notes or components or senior/subordinate notes or components or multiple components of such division, and which may be secured by some or all of the Collateral, or (iv) grant, pledge, assign a security interest in or otherwise collaterally transfer all or any portion of its rights under this Agreement and the Loan Documents to secure obligations of such Lender to any other Person (the transactions referred to in clauses (i) through (iv) above, each a "Secondary Market Transaction", and collectively "Secondary Market Transactions"). With respect to any Secondary Market Transaction described in clause (iii) above, such notes or note components may be assigned

76

different interest rates, so long as, at such time the weighted average of the relevant interest rates equals the Effective Rate; *provided, however*, that Borrower recognizes that, in the case of prepayments, the weighted average interest rate of the Loan may increase because Agent shall have the right to apply principal payments to one or more notes or components with lower rates of interest before applying principal payments to one or more notes or components with higher rates of interest. Borrower shall cooperate with Agent and Lenders and use Borrower's good faith efforts to facilitate the consummation of each Secondary Market Transaction including, without limitation, by:  (i) amending or causing the amendment of any Loan Document, and executing such additional documents, instruments and agreements as may be reasonably required by Agent or Lenders in connection with the relevant Secondary Market Transaction; (ii) promptly and reasonably providing such information (including, without limitation, financial information) as may be requested in connection with the preparation of a private placement memorandum, prospectus or a registration statement required to privately place or publicly distribute the securities in a manner which does not conflict with federal or state securities laws; (iii) providing in connection with each of (A) a preliminary and a final private placement memorandum or other offering documents or (B) a preliminary and final prospectus, as applicable (each, a "Disclosure Document"), a certificate certifying that Borrower has carefully examined those sections of such Disclosure Documents, as applicable, pertaining to Borrower, its Affiliates, the Loan, the Manager and the Property and that such sections (and any other sections reasonably requested by a Lender) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (iv) causing to be rendered such opinion letters reasonably requested by Agent or any Lender for the relevant Secondary Market Transaction; (v) making such representations, warranties and covenants, as may be reasonably requested by a Lender for the Secondary Market Transaction; and (vi) providing any other information and materials reasonably required in the Secondary Market Transaction.  Borrower shall be responsible only for its own costs and expenses (including attorneys' fees) and shall not be responsible for any third party costs and expenses incurred by Agent or Lenders in connection with any Secondary Market Transaction.

10.16  Construction.  Captions in this Agreement are included solely for convenience and are not to be referred to in construing or interpreting this Agreement.  Defined terms may be used in the singular or the plural, as the context requires.  All references to time of day mean the then applicable time in Baltimore, Maryland, unless otherwise expressly provided.  Each reference in this Agreement to a particular section is a reference to a section of this Agreement unless otherwise expressly indicated.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation".  Unless the context in which it is used otherwise clearly requires, the word "or" has the inclusive meaning represented by the phrase "and/or".  Unless the context in which it is used otherwise clearly requires, all references to days, weeks and months mean calendar days, weeks and months.  If any portion of this Agreement is declared invalid, illegal or unenforceable by any court of competent jurisdiction, such portion shall be deemed severed from this Agreement and the remaining portions shall continue in full force and effect.  Time is strictly of the essence of each and every provision of this Agreement.  This Agreement shall be governed by and interpreted and enforced under the laws of the United States and the regulations, rules, orders, requirements and policies of any federal departments, offices, bureaus, boards and other agencies, instrumentalities and authorities that have jurisdiction over Agent or Lenders or this Agreement to the extent that Agent or Lenders or this Agreement is subject to or governed by such federal laws, regulations, rules, orders, requirements and policies.

77

74561574v.6

10.17  <u>No Partnership</u>.  Borrower acknowledges and agrees that the provisions of this Agreement shall not create a partnership, joint venture or any other relationship among the Borrower, Agent and Lenders except the relationship of borrower and lenders.  Accordingly, nothing contained in this Agreement or in the other Loan Documents shall obligate or be deemed to obligate Agent or any Lender to pay any costs, fees or expenses of the Property, or to reimburse Borrower for any such costs or otherwise.  In addition, nothing in this Agreement or in any of the other Loan Documents shall be deemed to imply that Agent or any Lender is an owner or operator of the Property or any business or businesses located thereon or in connection therewith and neither Agent nor any Lender shall not be deemed to control or review Borrower's ownership or operation of the Property, or any business or businesses located thereon or in connection therewith.

10.18  <u>Financing Statements.</u>  Borrower agrees that Lender may file UCC-1 Financing Statements with the following description of the Collateral or a substantially similar description: "ALL ASSETS OF THE DEBTOR, WHEREVER LOCATED, WHETHER NOW OWNED OR EXISTING OR HEREAFTER ACQUIRED OR ARISING, TOGETHER WITH ALL PROCEEDS THEREOF."

10.19  <u>Press Releases</u>.  Borrower hereby consents to all news releases, publicity or advertising by Agent or any Lender, through any media intended to reach the general public, which refers to the Loan Documents or financing evidenced by the Loan Documents, to the Borrower or any of its Affiliates.

10.20  <u>Change in Law</u>.  If any Lender determines that any law, request, rule, guideline or directive of any Governmental Authority (whether or not having the force of law) (including the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III), or compliance therewith by such Lender (or any corporation controlling such Lender), has the effect of increasing such Lender's cost of making, issuing, funding or maintaining any extension of credit hereunder or committing to do any of the foregoing, or increasing the amount of capital or liquidity required or expected to be maintained by such Lender (or such corporation) or reducing the rate of return on capital (taking into consideration the Lender's (or such corporation's) policies with respect to capital adequacy, liquidity and such Lender's desired return on capital) as a consequence of its obligations under any Loan Document, then, in each case, the Borrower agrees, upon demand by such Lender (which demand shall be accompanied by a written statement setting forth the basis for such demand and a statement as to the method of the calculation of the amount thereof in reasonable detail), to pay to such Lender additional amounts sufficient to compensate such Lender for such increased costs, increased capital or liquidity requirements or reduced rate of return, as the case may be.

ARTICLE XI
AGENT

11.1  <u>Appointment and Authorization</u>.  Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Loan Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with

78

74561574v.6

all such powers as are reasonably incidental thereto. Subject to the terms of Section 11.16 and to the terms of the other Loan Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Loan Documents on behalf of Lenders. The provisions of this Article XI are solely for the benefit of Agent and Lenders and neither Borrower nor any other Loan Party shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for Borrower or any other Loan Party. Agent may perform any of its duties hereunder, or under the Loan Documents, by or through its agents or employees.

11.2    Agent and Affiliates. Agent shall have the same rights and powers under the Loan Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Loan Party or Affiliate of any Loan Party as if it were not Agent hereunder.

11.3    Action by Agent. The duties of Agent shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any of the Loan Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Loan Documents except as expressly set forth herein or therein.

11.4    Consultation with Experts. Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

11.5    Liability of Agent. Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Loan Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction. Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Loan Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Loan Document; (c) the satisfaction of any condition specified in any Loan Document; (d) the validity, effectiveness, sufficiency or genuineness of any Loan Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Loan Party. Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties. Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error. The sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled

79

(and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

11.6    Indemnification.    Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrower) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Loan Documents or any action taken or omitted by Agent hereunder or thereunder.  If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

11.7    Right to Request and Act on Instructions.    Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

11.8    Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents.

11.9    Collateral Matters.  Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Loan Commitment and payment in full of all Obligations; or (ii) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Loan Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of Borrower as to the sale or other disposition of property being made in full compliance with the provisions of the Loan Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Security Document constituting personal property described herein (it being understood and agreed that Agent may

80

74561574v.6

conclusively rely without further inquiry on a certificate of Borrower as to the identification of any personal property described herein). Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

11.10 <u>Agency for Perfection</u>. Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent, as provided in Section 11.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

11.11 <u>Notice of Default</u>. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". Agent will notify each Lender of its receipt of any such notice. Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof. Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

11.12 <u>Assignment by Agent; Resignation of Agent; Successor Agent</u>.

(a) Agent may at any time assign or participate its rights, powers, privileges and duties hereunder to (i) another Lender or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrower. Following any such assignment, Agent shall give notice to the Lenders and Borrower. In no event shall Borrower have the right to consent to any removal, replacement or assignment by the Agent or the Lenders. An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below. The Required Lenders may, with or without cause, discharge the Agent from all of its duties and obligations hereunder and under the other Loan Documents and appoint a successor Agent.

(b) Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrower. Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent. If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint

81

a successor Agent; provided that if Agent shall notify Borrower and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)    Upon (i) an assignment permitted by subsection (a) above or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article shall continue in effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

11.13  Payment and Sharing of Payment.

(a)    Loan Payments.  Payments of principal, interest and fees in respect of the Loan will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.

(b)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)    Defaulted Lenders.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make

74561574v.6

payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "**Lender**" (or be included in the calculation of "**Required Lenders**" hereunder) for any voting or consent rights under or with respect to any Loan Document.

(d)     Sharing of Payments. If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of this Agreement) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided, however*, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such recovery, without interest. Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by law, exercise all its rights of payment with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation). If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

11.14  Right to Perform, Preserve and Protect. If any Loan Party fails to perform any obligation hereunder or under any other Loan Document (after giving effect to any cure periods provided for in this Agreement or such other Loan Document), Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrower's expense. Agent is further authorized by Borrower and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrower, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations. Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section. Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section, in accordance with the provisions of Section 11.6.

11.15  Additional Titled Agents. Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Loan Documents. Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests

83

74561574v.6

in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

11.16    Amendments and Waivers.

(a)    No provision of this Agreement or any other Loan Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower, the Required Lenders and any other Lender to the extent required under Section 11.16(b); *provided, however*, that Agent shall be entitled, in its sole and absolute discretion, to waive any financial covenant of any Loan Party.

(b)    In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Loan Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)    if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)    if the rights or duties of Agent are affected thereby, by Agent;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed by all the Lenders directly affected thereby, (i) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (ii) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to this Agreement) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or for any termination of any commitment; (iii) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (iv) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (iv), as otherwise may be provided in this Agreement or the other Loan Documents (including in connection with any disposition permitted hereunder); (v) amend, waive or otherwise modify this or the definitions of the terms used in this Section insofar as the definitions affect the substance of this Section; or (vi) consent to the assignment, delegation or other transfer by any Loan Party of any of its rights and obligations under any Loan Document or release any Borrower of its payment obligations under any Loan Document, except, in each case with respect to this clause (vi), pursuant to a merger or consolidation permitted pursuant to this Agreement.  It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (iii), (iv), (v) and (vi) of the preceding sentence.

11.17    Assignments and Participations.

84

(a)  Assignments; Participations.

(i)  Any Lender may at any time assign or sell undivided ownership interests in the Loan, participations to one or more Eligible Assignees, or all or any portion of such Lender's Loan, together with all related obligations of such Lender hereunder.  Except as Agent may otherwise agree, the amount of any such assignment or participation (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however*, that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrower and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided, however*, that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

(ii)  From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to this Agreement).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender).  Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower any prior Note held by it.

(iii)  Agent, acting solely for this purpose as an agent of Borrower, shall maintain at its offices located in Baltimore, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof.  The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)  Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however*, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

74561574v.6

(v)     Notwithstanding the foregoing provisions of this Section or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "**Settlement Service**"). At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section. Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service. If so elected by Agent and Borrower, Agent's and Borrower's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)     Replacement of Lenders. Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in this Agreement, which demand shall not have been revoked, (ii) Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to this Agreement, (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Loan Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower and Agent may, at its option, notify such Affected Lender and, in the case of Borrower's election, the Agent, of such Person's intention to obtain, at Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender. In the event Borrower or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however,* that (i) Borrower shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment, and (ii) Borrower shall pay to Agent the $3,500 processing fee in respect of such assignment. In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section, such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrower, shall be effective for purposes of this Section and Section 11.17(a). Upon any such assignment and payment, such replaced Lender shall no longer constitute a "Lender" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth herein.

74561574v.6

(c)    Loan Party Assignments. No Loan Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Loan Document without the prior written consent of Agent and each Lender.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, Borrower but with prior notice to and consent of Agent, sell to one or more Eligible Assignees participating interests in its respective portion of the Loan, commitments or other interests hereunder (any such Eligible Assignee, a "Participant"). In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrower and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by Borrower shall be determined as if such Lender had not sold such participations and shall be paid directly to such Lender. Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders and Lenders agree to share with each Participant, as provided in Section 11.19.

11.18  Buy-Out Upon Refinancing. Agent shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

11.19  Lender's Rights to Offset, Set-Off. Notwithstanding anything to the contrary contained in Section 11.5, each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit or other indebtedness of Borrower whether or not located in any state with certain laws restricting lenders from pursuing multiple collection methods could result under such laws in significant impairment of the ability of all Lenders to recover further amounts in respect of the Loan. **THEREFORE, EACH LENDER AGREES THAT NO LENDER SHALL EXERCISE ANY SUCH RIGHT OF SET-OFF, BANKER'S LIEN, OR OTHERWISE, AGAINST ANY ASSETS OF BORROWER (INCLUDING ALL GENERAL OR SPECIAL, TIME OR DEMAND, PROVISIONAL OR OTHER DEPOSITS AND OTHER INDEBTEDNESS OWING BY SUCH LENDER TO OR FOR THE CREDIT OR THE ACCOUNT OF BORROWER) WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT AND THE REQUIRED LENDERS.**

11.20  Definitions. As used in this Article, the following terms have the following meanings:

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Affected Lender**" has the meaning set forth in Section 11.17(b).

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any

87

74561574v.6

entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to Agent.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Loan Document.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a placement agent, and (e) any other Person (other than a natural person) approved by Agent; *provided, however*, that notwithstanding the foregoing, "**Eligible Assignee**" shall not include Borrower or Borrower's Affiliates.

"**Participant**" has the meaning set forth in Section 11.17(d).

"**Replacement Lender**" has the meaning set forth in Section 11.17(b).

"**Settlement Service**" has the meaning set forth in Section 11.17(a)(v).

11.21  Payments.

(a)  If the Agent notifies a Lender or other holder of any Obligations (each, a "Lender Party"), or any Person who has received funds on behalf of a Lender Party (any such Lender Party or other recipient, a "Payment Recipient"), that the Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously received by, such Payment Recipient (whether or not such error is known to any Payment Recipient) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Payment Recipient shall promptly, but in no event later than one Business Day thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of then Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)  Without limiting immediately preceding clause (a), if any Payment Recipient receives a payment, prepayment or repayment (whether received as a payment,

88

74561574v.6

prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) that (x) is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) such Payment Recipient otherwise becomes aware was transmitted, or received, in error (in whole or in part):

 (i) (A) in the case of immediately preceding clause (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) in the case of immediately preceding clause (z), an error has been made, in each case, with respect to such payment, prepayment or repayment; and

 (ii) such Payment Recipient shall promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 11.21(b).

 (c) Each Lender Party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender Party under any Loan Document, or otherwise payable or distributable by the Agent to such Lender Party from any source, against any amount due to the Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

 (d) An Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations, except to the extent such Erroneous Payment comprises funds received by the Agent from a Loan Party for the purpose of making such Erroneous Payment.

 (e) To the extent permitted by applicable law, each Payment Recipient hereby agrees not to assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment, including without limitation any defense based on "discharge for value" or any similar doctrine, with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment.

 (f) Each party's agreements under this Section 11.21 shall survive the resignation or replacement of the Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Loan Commitment, or the repayment, satisfaction or discharge of any or all Obligations.

**SIGNATURES AND ACKNOWLEDGEMENTS ON
FOLLOWING PAGES**

74561574v.6

**IN WITNESS WHEREOF**, the Borrower, Agent and Lenders have caused this Agreement to be properly executed, by their respective duly authorized representatives, as of the date first above written.

**BORROWER:**

LHW MASTER TENANT LLC,
a Delaware limited liability company

By: _____
Name: Samuel Goldner
Title: Authorized Person

Signature Page to Loan Agreement

**AGENT:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By: _____
Name:
Title:

Jennifer M. Loucks
Vice President

**LENDER:**

**CAPITAL FUNDING, LLC,**
a Maryland limited liability company

By: _____
Name:
Title:

Jennifer M. Loucks
Vice President

Signature Page to Loan Agreement

## EXHIBIT A

## LEGAL DESCRIPTION

All of Lot 1, LIBERTY TERRACE FIRST PLAT, a subdivision in Liberty, Clay County, Missouri, according to the recorded plat thereof.

FOR INFORMATION ONLY:
Address: 2201 Glenn Hendren Drive, Liberty, MO, 64068-3375
Parcel No. 11-703-00-01-002.00

74561574v.6

**EXHIBIT B**

**COMPLIANCE CERTIFICATE**

Re:    Loan Agreement dated [_____], 202__ (together with amendments, if any, the "Loan Agreement") by and among _____, as Borrower, Capital Funding, LLC, as Agent on behalf of the Lenders (capitalized terms used but not defined herein have the meaning ascribed to them in the Loan Agreement)

The undersigned officer of the above named Borrower does hereby certify that for the financial period ending [[_____:

1.    No Default or Event of Default has occurred or exists except [[_____.

2.    The Debt Service Coverage for the Borrower for the preceding [[___month(s) (or such lesser period as shown have elapsed following the closing of the Loan) through the end of such period was:

        Required:    _____
        Actual:      _____

**The manner of calculation is attached.**

3.    The EBITDAR for the Facility for the [month] [annual] period is:

        Required:    $_____
        Actual:      $_____

**The manner of Calculation is attached**

4.    The Fixed Coverage Ratio for the Facility for the [month] [annual] period is:

        Required:    $_____
        Actual:      $_____

**The manner of Calculation is attached**

5.    The Debt Yield Percentage for the Facility for the [month] [annual] period is:

        Required:    _____
        Actual:      _____

**The manner of Calculation is attached**

6.    All representations and warranties contained in the Loan Agreement and other Loan Documents are true and correct in all material respects as though given on the date hereof, except [_____].

7.    All information provided herein is true and correct.

74561574v.6

8.    Capitalized terms not defined herein shall have the meanings given to such terms in the Loan Agreement.

Dated _____.

By: _____

Name: _____

Title: _____

## EXHIBIT C

## LOAN COMMITMENT

| Lender | Loan Commitment Percentage |
|---|---|
| Capital Funding, LLC | 100% |
| Total Loan Commitment Percentage | 100% |

# EXHIBIT D

## [Intentionally Deleted]

74561574v.6

## EXHIBIT E

## POST CLOSING REPAIRS AND REPLACEMENTS

Borrower shall complete in a good and workmanlike manner all the items of repair and replacement to the Property set forth in that certain Property Condition Report (the "Report") obtained by Lender and prepared by Tetra Tech copies of which have been provided to Borrower, for the cost and within the timeframe set forth below. Borrower must provide pictures of each completed repair line item and copy of paid invoices to be reimbursed the paid cost from the Required Repair Reserve.

| PROPERTY | | | | |
|---|---|---|---|---|
| | Repair Item | Critical/ Non-critical | Amount | Completion Date (number of days following Closing) |
| 1. | Items listed on Exhibit E-1 attached hereto | Critical (Immediate) | $9,172.00 | w/in 120 days after the Closing Date |
| 2. | Items listed on Exhibit E-2 attached hereto | Non-critical (short-term) | $1,500.00 | Prior to receiving the HUD Firm Commitment |

74561574v.6

## EXHIBIT E -1

## CRITICAL REPAIRS

| SPECIFIC CRITICAL REPAIR LIST | | | |
|---|---|---|---|
| **Description of Condition, Location(s), and Nature of Repair** | **Repair Costs** | | |
| | Labor | Material | Total |
| **Specific Interior Repairs** | | | |
| 1 | Arrange the bed positions to comply with UFAS bed clearances where possible.  These activities can be performed by in-house staff. | $        - | S        - | $        - |
| 2 | Insulate the p-traps in the 76 resident bathrooms and five public restrooms. | $    2,432 | $    3,040 | S    5,472 |
| 3 | Install lever-type handles on 80 interior resident doors. | $      800 | $    2,000 | S    2,800 |
| **Subtotal Interior Repairs** | | | S    8,272 |
| **Specific Exterior Repairs** | | | |
| 4 | Add one additional standard handicap parking space (to include vertical signage). | S    500 | $    400 | $    900 |
| **Subtotal Exterior Repairs** | | | $    900 |

**NOTE:** All repair costs include applicable State and local taxes.  Davis Bacon Wage Rates are not applicable.

74561574v.6

## EXHIBIT E -2

## NON-CRITICAL REPAIRS

| SPECIFIC NON-CRITICAL REPAIR LIST | | | |
|---|---|---|---|
| **Description of Condition, Location(s), and Nature of Repair** | **Repair Costs** | | |
| | Labor | Material | Total |
| **Specific Exterior Repairs** | | | |
| 1  Repair damaged concrete curbing at Ambulance Entrance. | $   500 | $   1,000 | $   1,500 |
| **Subtotal Exterior Repairs** | | | $   1,500 |

**NOTE:** All repair costs include applicable State and local taxes.  Davis Bacon Wage Rates are not applicable.

**EXHIBIT F**

**PERMITTED ENCUMBRANCES**

1.      Rights or claims of tenant pursuant to that certain Lase with no rights to purchase or rights of first refusal.

2.      All taxes for the year 2021 and all subsequent years, and any additional taxes for the current year or any prior years resulting from a reassessment, amendment or re-billing of taxes subsequent to the Date of Policy, nothing is due or payable as of the closing date.

3.      The following matters as set forth in the recorded plat of LIBERTY TERRACE FIRST PLAT, including but not limited to: Utilities and Drainage Easements to the City of Liberty, dated and recorded September 28, 1990 as Document No. G-78179 in Plat Book 24, Page 147 of the Clay County Records:
    a.      15' Drainage Easement
    b.      15' Utility Easement
    c.      15' Permanent U.E. & D.E.

4.      Lack of direct access to Interstate Route 35 from the land, such right of access having been taken by the State of Missouri, ex rel State Highway Commission of Missouri by condemnation suit no. 31455, and the Report of Commissioners, filed in the Circuit Court of Clay County, Missouri, at Liberty, recorded December 21, 1964 as Document No. B83780 in Book 842, Page 39 of the Clay County Records.

5.      Easement for Public Utility Mains and Drainage granted to the Mayor, Councilmen and Citizens of the City of Liberty, Missouri, dated September 29, 1983 and recorded October 12, 1983 as Document No. E65500 in Book 1520, Page 109 of the Clay County Records.

6.      Terms and provisions of the Cable Television Installation and Service Agreement between Kansas City Cable Partners and Liberty Terrace Care Center dated November 19, 1996 and recorded January 31, 1997 as Document No. N29625 in Book 2645, Page 590 of the Clay County Records.

7.      Easement for Public Utility Mains and Drainage granted to the Mayor, Council and Citizens of the City of Liberty, Missouri, dated October 24, 1990 and recorded October 25, 1990 as Document No. G80282 in Book 2001, Page 741 of the Clay County Records.

8.      The following matters as shown on that certain ALTA/NSPS Land Title Survey prepared by Sharon E. Sherrill on behalf of GRS Group dated August 30, 2021, as Project No. 21-53027.1:
    a.      Rights of others, both public and private in and to light standards, manholes, water valves, fire hydrants, curb inlets, telephone splice boxes, grated inlets, overhead electric wires, water lines, gas lines, telephone lines, water meters, gas valves on or crossing subject property
    b.      Asphalt extends past northerly record line

74561574v.6

## EXHIBIT G

## PAYMENT RESERVES

| Taxes (Monthly Deposit) | Insurance (Monthly Deposit | Realty and Equipment (Monthly Deposit) | Debt Service Reserve |
|---|---|---|---|
| $4,095.22 | $3,848.83 | $350/licensed bed/year | $157,527.00 |

# EXHIBIT H

## EXIT FEE

2.00% of proposed HUD Financing

**SCHEDULE 3.21**

**ORGANIZATIONAL CHART OF EACH LOAN PARTY**

Case 8-24-73789-jpm    Doc 29-3    Filed 10/22/24    Entered 10/22/24 19:47:54

## LIBERTY HEALTH & WELLNESS STRUCTURE





**MISSOURI LONG-TERM CARE PORTFOLIO**
**(Upper Tier Ownership)**

*Updated 3-22-2021*

| Investors | MT & OP |
|---|---|
| Susan Goldner | 4.612% |
| Chana Kahan | 13.610% |
| Leslie Kahan | 3.580% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Talia Mayer | 1.253% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Zachary Mayer | 1.253% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Abraham Mayer | 1.253% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Aviva Mayer | 1.253% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Aaron Mayer | 1.253% |
| Helene Mayer 2007 Irrevocable Exempt Trust fbo Akiva Mayer | 1.253% |
| Aaron Mayer | 0.880% |
| Gabriel Mayer | 1.250% |
| Warren Fendrich | 0.880% |
| *Total* | *32.33%* |

*\* Murphy and Talbot interests in Missouri OP Holdings LLC are a carried interests only (but their interests in Missouri MT Holdings LLC are capital interests that require capital contributions or dilution).*

| Management | MT & OP* |
|---|---|
| David Murphy | 5.000% |
| Robert Talbot | 5.000% |
| *Total* | *10.000%* |

**Goldner Family Trust**
(DE)
Trustee: Christiana Trust Company of Delaware

100%

**Goldner Capital Management LLC**
*(formerly known as Solomon Investments LLC)*
(DE)
Manager: Samuel Goldner

100%

**GCM Missouri LLC**
(DE)
Manager: Samuel Goldner

10%     57.670%     100%

**Missouri MT Holdings LLC**
(DE)
*Managers: GCM Manager LLC*

100%

*Master Tenant Holding Companies x3 and additional Tenant companies*

**Missouri OP Holdings LLC**
(DE)
*Manager: GCM Manager LLC*

100%

*Operating Holding Companies x3*

**Missouri MGMT Holdings LLC**
(DE)
*Manager: GCM Manager LLC*

100%

*Management Holding Companies x3*

4846-7934-3585, v. 4 / 7168.34

Page 1

Case 8-24-73789-jpm    Doc 29-3    Filed 10/22/24    Entered 10/22/24 19:47:54

*Updated 3-22-2021*

## MISSOURI LONG-TERM CARE PORTFOLIO
**(Tenant Holding Company Structure)**

Case 8-24-73789-jpm  Doc 29-3  Filed 10/22/24  Entered 10/22/24 19:47:54

```
                        ┌─────────────────────────────────────────┐
                        │         Missouri MT Holdings LLC          │
                        │                  (DE)                     │
                        │       Manager: GCM Manager LLC            │
                        └─────────────────────────────────────────┘
        100%              100%              100%              100%
```

| SIRO Prop Holdings LLC (DE) *Manager: GCM Manager LLC* | SIRO Master Tenant LLC (DE) *Manager: GCM Manager LLC* | LHW Master Tenant LLC (DE) *Manager: GCM Manager LLC* | SRZ Master Tenant LLC (DE) *Manager: GCM Manager LLC* |
|---|---|---|---|

4846-7934-3585, v. 4 / 7168.34

Page 2

Case 8-24-73789-jpm   Doc 29-3   Filed 10/22/24   Entered 10/22/24 19:47:54

*Updated 3-22-2021*

## Missouri Long-Term Care Portfolio
### (Operating Holding Company Structure)



4846-7934-3585, v. 4 / 7168.34

Page 3

## <u>Missouri Long-Term Care Portfolio</u>
### (Management Holding Company Structure)

Case 8-24-73789-jpm   Doc 29-3   Filed 10/22/24   Entered 10/22/24 19:47:54



## SCHEDULE 3.21

## CARES ACT OBLIGATIONS

NONE.

74561574v.6

## SCHEDULE 4.27

## POST-CLOSING OBLIGATIONS

NONE.

## FIRST AMENDMENT TO LOAN AGREEMENT

THIS FIRST AMENDMENT TO LOAN AGREEMENT (this "Amendment") is made as of this 1st day of June, 2023, by and among LHW MASTER TENANT LLC, a Delaware limited liability company (together with its successors and assigns, the "Borrower"), CAPITAL FUNDING, LLC, a Maryland limited liability company (together with its successors and assigns, individually as a "Lender" and as "Agent"), and the financial institutions or other entities from time to time parties hereto (each as a "Lender").

RECITALS:

A.      Pursuant to that certain Loan Agreement dated as of October 1, 2021, by and among Borrower, Agent and Lenders (as may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), Agent and Lenders agreed to make available to Borrower a loan (the "Loan"). Capitalized terms used but not defined in this Amendment shall have the meanings set forth in the Loan Agreement.

B.      Borrower, Samuel Goldner, an individual (with their successors and assigns, "Guarantor"), Agent and Lenders have entered into that certain Forbearance Agreement dated as of March 28, 2023, as amended by that certain First Amendment to Forbearance Agreement dated as of May 28, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Forbearance Agreement").

C.      Borrower has requested, and Agent and Lenders have agreed, to: (i) consent to the replacement of existing Operator with GLEN HENDREN DRIVE HEALTHCARE LLC, a Delaware limited liability company ("New Operator"), (ii) consent to the termination of that certain Lease Agreement dated as of October 1, 2021 (the "Existing Lease Agreement") by and between Borrower and existing Operator, (iii) approve that certain Operating Lease dated as of June 1, 2023 (the "New Lease Agreement") by and between Borrower and New Operator, (iv) consent to the termination of that certain Healthcare Facility Management Agreement dated as of October 1, 2021 (the "Existing Management Agreement") by and between existing Operator and LHW MGMT LLC, a Delaware limited liability company ("Existing Manager") (v) approve that certain Management Agreement dated as of June 1, 2023 (the "New Management Agreement") by and between New Operator and GLEN HENDREN DRIVE CONSULTING LLC, a Delaware limited liability company (the "New Manager"), all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing, the terms and conditions set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lender and Borrower hereby agree as follows:

1.      **Recitals**. The above statement of facts set forth in the Recitals is true and correct, and the Recitals are hereby incorporated herein as an agreement of Borrower, Agent and Lenders.

2.      **Earn-Out Amount**. Borrower, Agent and Lenders acknowledge that Agent has applied the amount of Ten Million and No/100 Dollars ($10,000,000.00) from the Earn-Out Holdback to partially prepay the Loan. Effective as of the date hereof, all references to the "Earn-Out Advance", the "Earn-Out Amount", the "Earn-Out Disbursement Conditions", the

1