**EXHIBIT F**

*Recorded in Clay County, Missouri*
Recording Date/Time: **07/28/2023** at **09:14:40 AM**
Book: **9601** Page: **85**

Instr #: 2023018148
Pages: 20
Fee: $81.00

*Electronically Recorded*
LANDMARK ABSTRACT AGENCY LLC



Sandra Brock
Recorder of Deeds

---

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

Title of Document:     Subordination and Attornment Agreement

Date of Document:     July 27, 2023

Landlord:     LHW MASTER TENANT LLC, a Delaware limited liability company

Landlord's Address:     525 Chestnut Street, Suite 102, Cedarhurst, NY 11516

Agent:     CAPITAL FUNDING, LLC, a Maryland limited liability company

Agent's Address:     1422 Clarkview Road, Baltimore, Maryland 21209

Operator     GLEN HENDREN DRIVE HEALTHCARE LLC, a Delaware limited liability company

Operator's Address:     15406 Meridian Avenue E, Suite 201, Puyallup, WA 98375

Legal Description:     See attached page labeled "Exhibit A"

Reference Book and Page:     N/A

This cover page is attached solely for the purpose of complying with the requirements stated in §§ 59.310.2; 59.313.2 RSMo 2001 of the Missouri Recording Act. The information provided on this cover page shall not be construed as either modifying or supplementing the substantive provisions of the attached document. In the event of a conflict between the provisions of the attached document and the provisions of this cover page, the attached document shall prevail and control.

95499747v.6

Recording Requested By
And When Recorded Mail To:

Capital Funding, LLC
1422 Clarkview Road
Baltimore, Maryland 21209
Attention: Stephanie Jenifer

---

## SUBORDINATION AND ATTORNMENT AGREEMENT

LHW MASTER TENANT LLC,
a Delaware limited liability company
(as Landlord)

CAPITAL FUNDING, LLC
a Maryland limited liability company
(as Agent)

GLEN HENDREN DRIVE HEALTHCARE LLC,
a Delaware limited liability company
(as Operator)

Liberty Health and Wellness
2201 Glen Hendren Drive, Liberty, MO 64068

95499747v.6

## SUBORDINATION AND ATTORNMENT AGREEMENT

NOTICE:    THE SUBORDINATION PROVIDED FOR IN THIS AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE INTEREST CREATED BY SOME OTHER OR LATER INSTRUMENT.

THIS SUBORDINATION AND ATTORNMENT AGREEMENT (this "Agreement"), dated July 27, 2023 but effective as of June 1, 2023, is made by and among LHW MASTER TENANT LLC, a Delaware limited liability company ("Landlord"), as landlord under the lease hereinafter described, and GLEN HENDREN DRIVE HEALTHCARE LLC, a Delaware limited liability company ("Operator"), in favor of CAPITAL FUNDING, LLC, a Maryland limited liability company (together with its successors and assigns, "Agent"), in its capacity as collateral and administrative agent for certain Lenders (defined below).

## WITNESSETH:

WHEREAS, pursuant to that certain Operating Lease dated as of June 1, 2023 (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Lease") by and between Landlord (as landlord) and Operator (as tenant), Operator has leased from Landlord, for the term and upon the conditions set forth therein, certain improved real property (the "Real Property") located in City of Liberty, County of Clay, State of Missouri with a legal description as set forth in Exhibit A attached hereto and incorporated herein by this reference, and covering the improvements situated thereon (the "Improvements" and together with the Real Property, the "Property");

WHEREAS, Landlord is indebted to the Lenders for a loan by Lenders to Landlord in the principal amount of Seventeen Million Eight Hundred Seventy-Six Thousand Three Hundred Forty and No/100 Dollars ($17,876,340.00) (the "Loan"), which Loan was made pursuant to that certain Loan Agreement, dated as of October 1, 2021, among Landlord, various financial institutions as are, or may from time to time become, parties thereto as lenders (collectively, "Lenders") and Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), and is evidenced by one or more Promissory Notes dated as of October 1, 2021, made by Landlord in favor of Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "Note"), in the aggregate principal amount of the Loan. The Note is secured by, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing covering the Property and other property described therein (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Security Instrument") and an Assignment of Rents and Leases (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Rents"), each dated as of October 1, 2021 and made by Landlord in favor of Agent, as agent for Lenders, and to be recorded with the Recorder of Deeds of Clay County, Missouri and by the other Loan Documents. The Loan Documents require the Lease to be subject to and subordinate to the Loan

95499747v.6

Documents. Operator will benefit from the Agent's and Lenders' agreement to consent to its leasing of the Property subject to the Loan and desires Landlord to subordinate the Lease as a condition to securing such consent. Capitalized terms used herein without definition will have the meanings ascribed to such terms in the Loan Agreement; and

WHEREAS, the parties hereto now desire to enter into this Agreement to establish certain rights and obligations with respect to their interests, and to provide for various contingencies as hereinafter set forth.

NOW, THEREFORE, in consideration for the foregoing recitals which are incorporated in the following agreement by this reference and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and of the mutual benefits to accrue to the parties hereto, it is hereby declared, understood and agreed that the Lease, all terms and conditions set forth in the Lease, the leasehold interests and estates created thereby, and the priorities, rights, privileges and powers of Operator and Landlord thereunder shall be and the same are hereby, and with full knowledge and understanding of the effect thereof, unconditionally made subject and subordinate to the lien and charge of the Security Instrument and the Loan Documents, all terms and conditions contained therein, any renewals, extensions, modifications or replacements thereof, and the rights, privileges and powers of the trustee and Agent thereunder, and shall hereafter be junior and inferior to the lien and charge of the Security Instrument and the Loan Documents. The parties further agree as follows:

1.      It is expressly understood and agreed that this Agreement shall supersede, to the extent inconsistent herewith, the provisions of the Lease relating to the subordination of the Lease and the leasehold interests and estates created thereby to the lien or charge of the Security Instrument.

2.      Agent and Lenders consent to the Lease.

3.      In the event Agent, any Lender or any other purchaser at a foreclosure sale or sale under private power contained in the Security Instrument, or by acceptance of a deed in lieu of foreclosure, succeeds to the interest of Landlord (collectively, a "Transferee") under the Lease by reason of any foreclosure of the Security Instrument or the acceptance by Agent or any Lender of a deed in lieu of foreclosure, or by any other manner (a "Triggering Event"), it is agreed that, if there is then outstanding an Event of Default under, and as defined in, the Lease or if Operator is in default under any agreement in effect between Operator and Agent or Lenders with respect to the Loan including, but not limited to, this Agreement and/or the Lease Payment Agreement dated of even date herewith (the "Operator Loan Documents"), then such Transferee may terminate the Lease, and all of the rights of Operator thereunder, effective upon ten (10) days prior written notice to Operator or such longer notice period as may be required for compliance with applicable law including, but not limited to, the laws governing the licensure of the nursing home operated on the Property (a "Termination Notice"). In the event the Transferee does not give Operator a

2

Termination Notice pursuant to this Section 3, and notwithstanding the subordination of the Lease provided for hereinabove:

(a)      Operator shall be bound to such Lender, Agent or such other purchaser under all of the terms, covenants and conditions of the Lease for the remaining balance of the term thereof, with the same force and effect as if such Lender, Agent or such other purchaser were the lessor under such Lease, and Operator does hereby agree to attorn to such Lender, Agent or such other purchaser as its lessor, such attornment to be effective and self-operative without the execution of any further instruments on the part of any of the parties to this Agreement, immediately upon Lender, Agent or such other purchaser succeeding to the interest of Landlord under the Lease.

(b)      Subject to the observance and performance by Operator of all the terms, covenants and conditions of the Lease on the part of the Operator to be observed and performed, Lenders, Agent or such other purchaser shall recognize the leasehold estate of Operator under all of the terms, covenants and conditions of the Lease for the remaining balance of the term (as the same may be extended in accordance with the provisions of the Lease) with the same force and effect as if such Lender, Agent or such other purchaser were the lessor under the Lease and the Lease shall remain in full force and effect and shall not be terminated, except in accordance with the terms of the Lease or this Agreement; provided, however, that such Lender, Agent or such other purchaser shall not be (i) liable for any act or omission of Landlord or any other prior lessor under the Lease, (ii) obligated to cure any defaults of Landlord or any other prior landlord under the Lease which occurred prior to the time that such Lender, Agent or such other purchaser succeeded to the interest of Landlord or any other prior lessor under the Lease, (iii) subject to any offsets, claims, credits or defenses which Operator may be entitled to assert against Landlord or any other prior lessor, (iv) bound by any payment of rent or additional rent by Operator to Landlord or any other prior lessor for more than one (1) month in advance unless and until Lenders, Agent or such other purchaser has actually received for its own account as lessor the full amount of such prepaid rent, (v) bound by any amendment or modification of the Lease made without the written consent of Agent or such other purchaser, or (vi) liable or responsible for or with respect to the retention, application and/or return to Operator of any security deposit paid to Landlord or any other prior landlord, whether or not still held by Landlord, unless and until Lenders, Agent or such other purchaser has actually received for its own account as lessor the full amount of such security deposit.

4.      Operator hereby agrees that it will not exercise any right granted it under the Lease, or which it might otherwise have under applicable law, to terminate the Lease on account of a default of Landlord thereunder or the occurrence of any other event without first giving to Agent prior written notice of its intent to terminate, which notice shall include a statement of the default or event on which such intent to terminate is based. Thereafter, Operator shall not take any action to terminate the Lease if Agent (i) within thirty (30) days after service of such written notice on Agent by Operator of its intention to terminate the Lease or such shorter cure period as may be necessary to ensure compliance of the Property with applicable law, shall cure such default or

3

95499747v.6

event if the same can be cured by the payment or expenditure of money, or (ii) shall diligently take action to obtain possession of the leased premises (including possession by receiver) and to cure such default or event in the case of a default or event which cannot be cured unless and until Agent has obtained possession and which does not constitute non-compliance of the Property with applicable law, but in no event to exceed ninety (90) days after service of such written notice on Agent by Operator of its intention to terminate.

5.      For the purposes of facilitating Lenders' and Agent's rights hereunder, Agent shall have, and for such purposes is hereby granted by Operator and Landlord, pursuant to the terms of the Loan Agreement, the right to enter upon the Property and the Improvements thereon for the purpose of effectuating any such cure.

6.      Operator hereby agrees to use good faith efforts to give to Agent concurrently with the giving of any notice of default to Landlord under the Lease, a copy of such notice by mailing the same to Agent in the manner set forth hereinbelow and no such notice given to Landlord which is not at or about the same time given to Agent shall be valid or effective against Agent for any purpose but the validity and effectiveness of any such notice given to Landlord shall not, as to Landlord, be affected by the failure to deliver a copy thereof to Agent pursuant to this Section 6.

7.      (a)      To the extent permitted by applicable law, Operator hereby grants Agent, for its benefit and the benefit of Lenders, its successors and assigns, a continuing security interest in the "Collateral" (as defined below) to secure the full payment and performance of all obligations and liabilities of Operator under the Lease, hereunder or under any of the other Operator Loan Documents.

(b)      The "Collateral" means "all-assets" of the Operator, and includes all of the following, whether now owned or hereafter existing or arising: (i) the facility license (the "License") for the skilled nursing facility operated by Operator upon the Property (the "SNF"); (ii) all Medicare and Medicaid provider agreements associated with the operation of the SNF (the "Provider Agreements") whether now or hereafter in effect and all rights to payment thereunder; (iii) the Certificates of Need, if any, with respect to the SNF together with all replacements or proceeds thereof; (iv) all of Operator's deposit accounts, as such term is defined in the Uniform Commercial Code; (v) all subleases, licenses, concessions, residency agreements, occupancy agreements and other agreements for the use or occupancy made or agreed to by Operator, and any and all amendments, extensions, renewals, modifications and replacements thereof pertaining to all or any part of Operator's leasehold interest in the Property, or any possessory interest therein, whether such subleases or other agreements have been heretofore or are hereafter made or agreed to, and all rents, issues and profits and any other payments by any and all residents, patients or other sub-lessees or any third-party insurer which may hereafter become due pursuant to any such agreements or subleases, and any and all moneys, awards or other payments made or payable by any and all residents, patients or sub-lessees or any third-party insurer in lieu of rent, including, but not limited to, any damages which may hereafter become due pursuant to any such subleases or other agreements; (vi) all inventories of food, beverages and other comestibles held by Operator

4

for sale or use at the Property and soap, paper supplies, medical supplies, drugs and all other such goods, wares and merchandise held by Operator for sale to or consumption by residents, guests or patients of the SNF and all such other goods returned to or repossessed by Operator; (vii) all licenses, permits and certificates used or useful in connection with the leasing, operation, use or occupancy of the Property and/or the SNF, including, without limitation, business licenses, state health department licenses, food service licenses, licenses to conduct business, certificates of need, air quality permits, software licenses; (viii) all of Operator's goods, furniture, furnishings, objects of art, machinery, tools, supplies, appliances, general intangibles, contract rights, franchises, licenses, certificates, permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, other than fixtures, which are now or hereafter owned by Operator and which are located within or about the Property, together with all accessories, replacements and substitutions thereto or therefore and the proceeds thereof; (vi) any accounts including, without limitation health care insurance receivables, of or receivable by Operator arising from or relating to the Property or payments due to or to be made to Operator relating to the operation of the Property from and after the date of this Agreement under or relating to: (a) the Provider Agreements, (b) agreements with or on behalf of patients or residents of the Property (c) other similar contracts relating to the Property (or any proceeds thereof) or (d) other rights of Operator to receive payment of any kind with respect to the operation of the Property from and after the date of this Agreement (collectively, the "Accounts Receivable"); and (vii) any and all proceeds of each of the foregoing.

(c)    Operator has good and marketable title to the Collateral, subject to no lien, mortgage, pledge, encroachment, zoning violation or encumbrance, other than liens granted to Landlord under the terms of the Lease or otherwise permitted by the terms of the Lease which may be granted or withheld in Landlord's or Agent's absolute discretion. Notwithstanding the foregoing, Agent agrees that the Agent's lien on certain portions of the Collateral as set forth herein shall be subordinate to that certain working capital loan from eCAPITAL HEALTHCARE CORP., a Delaware corporation, as working capital lender to Operator (the "AR Loan"), pursuant to the terms of that certain Intercreditor Agreement dated on or around the date hereof by and between eCAPITAL HEALTHCARE CORP., a Delaware corporation, as working capital lender and Agent on behalf of the Lenders, as mortgage lender.

(d)    Pursuant to the terms of the Lease, Landlord has a security interest in and to some or all of the Collateral of Operator. In order to induce Lenders to consent to the Lease, Landlord hereby agrees that the priority and lien of Landlord's security interest in and to any or all of the Collateral is hereby subordinated, and made junior to the security interest of Agent in the Collateral, and any and all rights and interest of Landlord as a secured party with respect to the Collateral is and shall be for all purposes junior and subordinate to the rights and interest of Agent as a secured party in such Collateral as established by this Section 7. The foregoing subordination by Landlord is and shall be at all times effective, notwithstanding any action by Landlord under the Lease and/or the applicable provisions of the Uniform Commercial Code, as amended from time to time (the "UCC") regarding the grant, attachment, and/or perfection of Landlord's security

5

interest in the Collateral, and/or the priorities that otherwise ordinarily would result under the UCC or other applicable law affecting the order of granting or perfection of security interests.

(e)     Operator shall sign and deliver to Agent, or if Operator's signature is not required, Operator hereby authorizes Agent to file in all necessary governmental offices, one or more financing statements to perfect the security interests in the Collateral. Any such financing statement may describe the Collateral as "All assets of the Debtor wherever located, whether now owned or hereafter existing or hereafter acquired or arising, together with all proceeds thereof" or a similar description describing all assets or all personal property of Operator. Agent shall have all rights and remedies available to a secured party under the UCC. Until the earlier of full payment and performance of the Loan Obligations or expiration of the Lease term, Operator shall not pledge or otherwise grant a security interest in any of the Collateral to a third party (other than a Permitted Encumbrance) without Agent's and, to the extent required by any mortgage or other security instrument endorsed for insurance by HUD (as defined below), the Commissioner's prior written consent. Operator acknowledges that Landlord has assigned its rights under the Lease to Agent as security for the Loan Obligations which are secured by the Security Instrument and that the security interest herein granted serves as security for the said loan. The provisions of this Section 7 shall be deemed to be a Security Agreement.

(f)     Attached hereto as Exhibit C is a true and correct copy of the ownership chart of Operator.

(g)     Each of the Loan Documents to which Operator is a party constitutes a valid and legally binding obligation of Operator, enforceable in accordance with its respective terms (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium, or other laws relating to the rights of creditors generally and by general principles of equity) and does not, in any material respect, violate, conflict with, or constitute any default under any law, government regulation, decree, judgment, Operator's articles of organization or incorporation, partnership agreement/operating agreement or by-laws, as applicable, or any other agreement or instrument binding upon Operator.

(h)     Operator has no outstanding Indebtedness, secured or unsecured, direct or contingent (including any guaranties), other than the AR Loan and Indebtedness which represents liabilities incurred in the ordinary course of business (which shall include equipment or insurance financing). Operator hereby covenants and agrees that while the Loan remains outstanding, Operator shall not incur any additional Indebtedness other than (i) liabilities incurred in the ordinary course of business (which shall include equipment or insurance financing, to be secured only by the equipment or insurance proceeds, respectively) or (ii) in connection with the AR Loan.

(i)     No action or investigation is pending or threatened before or by any court or administrative agency which might result in any material adverse change in the financial condition, operations or prospects of Operator or any reduction of the reimbursement rate under the Reimbursement Contracts.  Operator is not in violation of any agreement, the violation of

6

95499747v.6